## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CAROLYN K. CHAUDRY, as | : | Hon. Joseph H. Rodriguez |
| Administratrix Ad Prosequendum of the | : | |
| Estate of Joey Myers, and in her own | : | |
| right, et al., | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. 17-1411 |
| | : | |
| v. | : | OPINION |
| | : | |
| CHIEF JODY FARABELLA, et al., | : | |
| | : | |
| Defendants. | : | |

Presently before the Court is the Motion for Summary Judgment of Defendants Chief Jody Farabella, City of Millville, Officer Michael Calchi, Officer Gavin Phillips, and Officer Jeffrey Profitt [Dkt. No. 62]. The Court has considered the written submissions of the parties and the arguments advanced at the hearing on March 3, 2020. For the reasons expressed on the record that day as well as those that follow, Defendants Motion for Summary Judgment will be granted.

Plaintiff Carolyn K. Chaudry brings this action on behalf of the Estate of Joey Myers ("Myers") alleging, inter alia, excessive force during the course of the arrest of Joey Myers by members of the Millville Police

Department on January 18, 2016.[1]  Most of the facts are undisputed.  Myers broke into Bim's Pizzeria and stole money and a loaded handgun out of a safe in the building.  The police were alerted to the break-in and responded with several officers and a canine officer, Chase.  After a search of the building, Myers was arrested in the basement of the pizzeria.  Once at the police station, Myers issued a full confession during a videotaped interview.  Plaintiff does not challenge the confession.

The series of events that occurred during Myers' apprehension form the basis for this action.  The Complaint alleges that Myers was bitten repeatedly by a police dog resulting in a piece of his ear being completely severed. After having a piece of his ear bitten off, while lying face down on a flight of stairs, the complaint alleges that Myers was tackled and struck three times in his already damaged face by Officer Phillips before being placed under arrest.  The Complaint alleges that the amount of force used in Myers' arrest was unreasonable and resulted in a deprivation of his constitutional rights under the Fourth Amendment.  In addition, the Complaint sets forth a claim of municipal liability against the City of

---

[1] Plaintiff levies six counts against the parties as follows: Count I Federal Constitutional Violation against Chief Farabella and the City of Millville, Count II Federal Constitutional Violation against Officers Profitt, Phillips, and Calchi, Count III Supervisory Claim against Chief Farabella, Count IV Violation of the New Jersey Civil Rights Act against the Individual Officers, Count V Battery, and Count VI Negligence.

Millville for failure to follow its policies regarding the handling of canine officers.[2]

Unfortunately, Myers died in an unrelated incident before the Complaint was filed.  This leaves Plaintiff without the benefit of testimony from Myers that could challenge or clarify some of the events detailed in the police reports.   As a result, a majority of the events on January 18, 2016 are not in dispute.  The question before the Court is whether there is enough inconsistency in the testimony of the officers to create a genuine issue of material fact and whether the actions of canine officer Chase and his handler are *ipso facto* evidence of excessive force under the circumstances.

## I.    Background

According to Plaintiff, the facts of the arrest of Myers are as follows. The Millville Police responded to a dispatch call indicating a break in at Bim's Pizzeria on January 18, 2016.  By the time Officer Calchi and his

---

[2] The individual defendants are sued in both their official and personal capacities. T**Error! Main Document Only.Error! Main Document Only.**he United States Supreme Court has held that "neither a State nor its officials acting under their official capacities are 'persons' amenable to suit under § 1983." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). As such, an employee of the State named as a defendant in a civil rights action may be held liable for damages only if that person has personal involvement in the alleged wrongs and is sued in their personal capacity. See Hafer v. Melo, 502 U.S. 21, 31 (1991) ("state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983"). Summary judgment will be granted as to the individual defendants sued in their official capacities.  In addition, during oral argument, Plaintiff conceded that there is no basis for the claims against Officer Jeffrey Profitt.  As a result, summary judgment will be granted in Profitt's favor.

canine partner, Chase, arrived on the scene, several other police officers were already present.  Officer Phillips was on the scene and he entered the building through an open window.  Officer Calchi and Chase also entered the building as Officer Profitt arrived on the scene.

When Profitt attempted to enter the building through a window, Chase, who was already inside, grabbed ahold of Profitt and bit him. Calchi gave Chase a command to release Profitt; the canine did not respond, causing Calchi to grab Chase by the collar and pull him off Profitt.[3] Then, Calchi and Chase began to search the premises for a suspect. Calchi sent Chase into several areas of the building before they attempted to check the basement. Calchi waited at the top of the basement steps as Chase descended the stairs.  There is no dispute as to Plaintiff's version of these facts.

According to Plaintiff, Calchi's written police report indicates that although he provided two announcements alerting inhabitants of the building to the presence of the dog before he himself entered the building to begin the search, Calchi did not make a similar announcement when Chase descended the basement steps.  The basement was dark and Calchi claims that he and Chase navigated in darkness as he moved a bicycle, toolbox and

_____

[3] Profitt was transported to the hospital and was ultimately absent from work for approximately eight weeks. He played no role in the arrest of Myers.

some other items out of the way. Calchi called for Phillips to enter the basement and then signaled for Chase to search under the stairwell, telling the dog to "find him."  When Phillips arrived in the basement, he observed Chase go into an opening under the stairs and grab someone.  Myers was under the stairs.

Plaintiff claims that Chase repeatedly bit Myers, inflicting a wound on his right leg, and that Calchi did not give Chase any commands to release Myers. Phillips states that he did not know who was under the stairs with the dog, but he knew that Chase grabbed ahold of something because Calchi was yelling at somebody. When Phillips first saw Myers' legs, Myers was laying on his stomach and he then proceeded to pull Mr. Myers out by his legs, all while not being able to see where Chase was located. Phillips testified that Calchi gave Chase the command to release Myers after Phillips pulled him out from the stairs.

Phillips states that standard procedure is not to touch a suspect under the control of a Canine Officer.  Chase took some time to "apprehend" Myers and Calchi gave Chase the release command. Phillips explained that he had to wait for Calchi to release Chase, because he wanted to prevent being bitten by the dog himself. Id. Eventually, Phillips pulled Myers out from underneath the stairs and Chase released his grasp.  Phillips states

that because he knew that Chase's grasp was somewhere north of Mr. Myers' knees, he grabbed an area south of that region.

According to Plaintiff, even though Calchi did not give Chase any commands to release Myers while Phillips had hold of Mr. Myers' ankles, Chase re-engaged Myers on the side of his face and bit off part of Myers' ear. Plaintiff claims the dog is trained to avoid biting any area near the face and the fact that Chase bit Myers' ear is evidence in itself of excessive force. Finally, Plaintiff claims that Phillips struck Myers prior to handcuffing him. In the statement of facts, Plaintiff acknowledges that Myers kept trying to stand up and was squirming. See PSSDF ¶ 94.   While trying to handcuff Myers and stand him up, Phillips and Myers "tussled" and he was "somehow shoved" and then got back up and tackled Myers on the stairs. Id., at ¶ 96. Phillips struck Myers on the side of the face three times, while Myers was lying face down on the stairs. Id. at ¶ 97. After the second strike to Myers, Phillips told him to stop resisting and struck Myers a third time which resulted in Myers putting his hands behind his back. Id. Between the second and third strike, Phillips was on top of Myers and Myers could not stand up. Id. at ¶ 99.

After Phillips struck Myers in the face three times and handcuffed him, Phillips saw Myers' damaged ear, which was bloody and missing a

piece of the ear. Id. at ¶ 100. Myers was taken to the hospital as a result of being bitten by Chase at which time Calchi photographed Myers' injuries. Id. at ¶ 101. The photographs confirm that there is damage to Myers' ear and face and that he had a laceration on his leg from Chase's initial engagement.  There is no dispute as to the injuries suffered by Myers or that the injury to the ear was particularly severe.  Rather, the parties disagree over the circumstances confronting the police when they encountered Myers, the necessity to use the force applied during the arrest, and the behavior of the dog.

## II.   Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (a). Thus, the Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations,

stipulations . . . admissions, interrogatory answers, or other materials."
Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable
jury could return a verdict in the nonmoving party's favor. Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under
the governing substantive law, a dispute about the fact might affect the
outcome of the suit. Id. In determining whether a genuine issue of material
fact exists, the court must view the facts and all reasonable inferences
drawn from those facts in the light most favorable to the nonmoving party.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the
absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477
U.S. 317, 323 (1986). Once the moving party has met this burden, the
nonmoving party must identify, by affidavits or otherwise, specific facts
showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's
Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand
a properly supported motion for summary judgment, the nonmoving party
must identify specific facts and affirmative evidence that contradict those
offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving
party may not 'rest upon mere allegations, general denials or . . . vague

statements . . . .'" <u>Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs</u>, 982 F.2d 884, 890 (3d Cir. 1992) (quoting <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

<u>Celotex</u>, 477 U.S. at 322. That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B); <u>accord</u> Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). Credibility determinations are the province of the factfinder. <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

### III.   **Discussion**

Plaintiff's Constitutional claims are governed by Title 42 U.S.C. § 1983, which provides a civil remedy against any person who, under color of state law, deprives another of rights protected by the United States

Constitution. See Collins v. City of Harker Heights, 503 U.S. 115, 120

(1992).[4] Any analysis of 42 U.S.C. § 1983 should begin with the language of

the statute:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

See 42 U.S.C. § 1983.

As the above language makes clear, Section 1983 is a remedial statute

designed to redress deprivations of rights secured by the Constitution and

its subordinate federal laws. See Baker v. McCollan, 443 U.S. 137, 145 n.3

(1979). By its own words, therefore, Section 1983 "does not . . . create

substantive rights." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir.

2006) (citing Baker, 443 U.S. at 145, n.3).

To state a cognizable claim under Section 1983, a plaintiff must allege

a "deprivation of a constitutional right and that the constitutional

---

[4] Plaintiffs' State Constitutional claims under the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, follow the analysis under 42 U.S.C. § 1983. Hedges v. Musco, 204 F.3d 109, 121 n. 12 (3d Cir. 2000) (concluding that New Jersey's constitutional provision concerning unreasonable searches and seizures is interpreted analogously to the Fourth Amendment); Pettit v. New Jersey, 2011 WL 1325614, at *3 (D.N.J. Mar. 30, 2011) ("This district has repeatedly interpreted NJCRA analogously to § 1983."). As a result, the Court will analyze Plaintiff's state and federal constitutional claims concurrently, using the analysis under § 1983.

deprivation was caused by a person acting under the color of state law."
Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (citing
Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996)). Thus, a plaintiff must
demonstrate two essential elements to maintain a claim under § 1983: (1)
that the plaintiff was deprived of a "right or privileges secured by the
Constitution or the laws of the United States" and (2) that plaintiff was
deprived of his rights by a person acting under the color of state law.
Williams v. Borough of West Chester, Pa., 891 F.2d 458, 464 (3d Cir. 1989).
There is no dispute that Calchi and Phillips were acting under the color of
state law.

Additionally, the doctrine of qualified immunity provides that
"government officials performing discretionary functions . . . are shielded
from liability for civil damages insofar as their conduct does not violate
clearly established statutory or constitutional rights of which a reasonable
person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818
(1982). Thus, government officials are immune from suit in their individual
capacities unless, "taken in the light most favorable to the party asserting
the injury, . . . the facts alleged show the officer's conduct violated a
constitutional right" and "the right was clearly established" at the time of
the objectionable conduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). Courts

11

may exercise discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably" and it "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. Id. (internal quotation omitted). Properly applied, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 5623 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). That is, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Couden v. Duffy, 446 F.3d 483, 492 (3d Cir,

2006). "If the officer's mistake as to what the law requires is reasonable," the officer is entitled to qualified immunity. Id. (internal citations omitted). Further, "[i]f officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." Malley, 475 U.S. at 341. See also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (The general touchstone is whether the conduct of the official was reasonable at the time it occurred.). Finally, because qualified immunity is an affirmative defense, the burden of proving its applicability rests with the defendant. See Beers-Capital v. Whetzel, 256 F.3d 120, 142, n.15 (3d Cir. 2001).

Plaintiff's constitutional claims allege violations of his Fourth Amendment rights. "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." Brower v. County of Inyo, 489 U.S. 593, 599 (1989), quoted in Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999). A seizure occurs "[w]henever an officer restrains the freedom of a person to walk away...." Tennessee v. Garner, 471 U.S. 1, 7 (1985). There is no dispute that a seizure occurred when the officers arrested Myers. The question is whether the officers used an unreasonable amount of force to arrest Myers.

A Fourth Amendment excessive force claim calls for an evaluation of whether police officers' actions are objectively reasonable in light of the facts and circumstances confronting him. Graham v. Conner, 490 U.S. 386, 397 (1989). While the question of reasonableness is objective, the court may consider the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. Id.

In a claim for excessive force, "the central question is 'whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)). Moreover, the failure to stop the use of excessive force may also violate the Fourth Amendment. See, e.g. Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002) (A § 1983 claim for the failure to stop the use of excessive force rises to the level of a constitutional violation where excessive force was used and defendants had a reasonable opportunity to prevent the use of excessive force).

The qualified immunity analysis gives great deference "to the circumstances of police action, which are often 'tense, uncertain, and rapidly evolving.'" Groman v. Township of Manalapan, 47 F.3d 628, 634

(3d Cir. 1995) (quoting <u>Graham</u>, 490 U.S. at 396). <u>See</u> <u>also</u> <u>Graham</u>, 490

U.S. at 396-97 (analyzing reasonableness of use of force "from the

perspective of a reasonable officer on the scene, rather than with the 20/20

vision of hindsight"). In addition, the "standard of reasonableness at the

moment applies: 'Not every push or shove, even if it may later seem

unnecessary in the peace of a judge's chambers,' violates the Fourth

Amendment." <u>Graham</u>, 490 U.S. at 396 (quoting <u>Johnson v. Glick</u>, 481 F.2d

1028, 1033 (2d Cir. 1973)).  "Other relevant factors include the possibility

that the persons subject to the police action are themselves violent or

dangerous, the duration of the action, whether the action takes place in the

context of effecting an arrest, the possibility that the suspect may be armed,

and the number of persons with whom the police officers must contend at

one time." <u>Sharrar v. Felsing</u>, 128 F.3d 810, 822 (3d Cir. 1997).

     Thus, the question here is whether the force applied by Calchi and

Phillips, through their own conduct and in the deployment of Canine

Officer Chase, was objectively reasonable in light of the circumstances.

     On this record, the Court finds that the actions of Calchi and Phillips

were objectively reasonable under the circumstances, entitling defendants

to qualified immunity because there is no constitutional violation.  First,

the "[u]se of a police dog to bite and hold a suspect is not per se

unreasonable." <u>Moore v. Vangelo</u>, 222 Fed. Appx. 167, 170 (3d Cir. 2007). "[P]olice dogs can—and often do—cause serious harm,' ... the use of K-9 force to apprehend suspects where the Graham factors weigh in favor of the police is reasonable." <u>Vangelo</u>, 222 Fed. Appx. at 170 (quoting <u>Vera Cruz v. City of Escondido</u>, 139 F.3d 659, 661 (9th Cir. 1997)).

There is no doubt that Myers suffered severe injury from his encounter with Chase.  Plaintiff's offer of an expert opinion, by Richard Rivera, to demonstrate that Chase acted outside the bounds of police policy and standards does little to challenge the circumstances described by Calchi and Phillips in regard to Myers' fighting with Chase.  Moreover, Mr. Rivera's opinion is frought with impermissible legal conclusions.[5]  Such conclusions not only fail to pass muster under Rule 704, but also are speculative and insufficient to defeat summary judgment. <u>See</u> <u>Berckeley Inv. Grp., Ltd. v. Colkitt</u>, 455 F.3d 195, 217 (3d Cir. 2006); <u>United States v. Leo</u>, 941 F.2d 181, 196–97 (3d Cir. 1991).

Second, applying the Graham factors, the actions of the Calchi and Phillips were objectively reasonable under the circumstances.  The officers responded to dispatch reports of a burglary. Once inside the building, Calchi noticed that the safe was breached and, while ammunition was

---

[5] For example, Rivera concludes that "the use of force upon Mr. Myers ... was not objectively reasonable as applied in <u>Graham v. Connor</u>."  [Ex. 11, Rivera Report, p. 19.]

present, there was no firearm in the safe. [Ex. 2, Calchi Report.] Calchi

reasonably surmised that the suspect(s) could be in possession of a loaded

firearm. [Id.][6] In addition, the building was dark, and despite Calchi's

announcement of the presence of a dog, which Myers confirms in his

statement to police that he heard, Myers did not respond.[7]

Once Calchi searched the main floor, he turned his attention to the

basement, which was cluttered and dark. Calchi sent Chase to investigate

the basement and when he noticed a change in the dog's posture, he called

Phillips for assistance because he thought a suspect was nearby. [Ex. 2,

Calchi Report; Ex. 4, Phillips Report; Ex. 20:28, Phillips Dep.; Ex. 19 at 51-

52.] Phillips and Calchi both report that Chase kept returning to the area

near the basement stairs but was having trouble negotiating the clutter.

[Id.] Once Calchi cleared out some clutter, Chase explored a space beneath

the stairs and found Myers hiding. [Id.; Ex. 3, Phillips Report; Ex. 19, p. 53-

54.]

---

[6] Plaintiff contends that because the police officers responding to the scene saw a person run away from the building, it may not have been clear that any suspects remained inside.  This argument falls flat.

[7] Calchi proffers in his report that he gave two loud verbal announcements through the window stating, "This is the Police. You are under arrest.  I have a trained Police Dog.  Make yourself known and surrender. If you do not comply, I will release him. He will find you and bite you." [Ex.2, Calchi Report.] Myers admitted in his statement that he heard this announcement and understood that his silence would cause the dog to be released. [Ex. 5, VTS 02_1, 8:35; Ex. 19, page 41-42. 9; Ex. 2.]

Both officers report that Chase latched onto Myers; Calchi states that Chase engaged Myers on the right leg while Phillips was unsure which part of the body Chase latched onto. [Ex. 2, Calchi Report; Ex. 20 at p. 30.] Phillips reports that he witnessed Myers actively fight with Chase. [Ex. 3, Phillips Report; Ex. 20, pp. 30-31.] Calchi's report goes further and details that Myers punched Chase with a closed fist causing Chase to release his bite. [Ex. 2, Calchi Report; Ex. 19, p. 57.] Then Chase re-engaged by latching onto Myers' right ear. [Id.]

At some point during the tussle, but apparently after Chase latched onto Myers' ear, Phillips endeavored to restrain Myers and place him in handcuffs. [Ex. 3, Phillips Report; Ex. 20, pp. 30-31.]  Calchi ordered Chase to disengage and Chase obeyed the command. [Id.] But, Myers continued to resist; Myers was able to get to his feet, push Phillips into clutter, and refused to place his hands behind his back. [Id.; Ex. 2, Calchi Report.] Phillips describes fighting with Myers and Myers' attempts to run up the stairs. During this time, Calchi saw a handgun fall out of Myers' pocket. Phillips eventually subdued Myers and admits employing three closed-fisted strikes to Myers' head to stifle Myers' resistance. [Ex. 3. Then, Myers' was handcuffed. Ex. 20, pp. 40-41.]

18

Calchi and Phillips, among others, responded to a dispatch call of a break-in. Upon arrival, they navigated an otherwise empty building in search of a potential suspect they had reason to believe was armed. The circumstances of the basement presented a heightened level of concern given the amount of debris, hiding places, and darkness. Using Chase to help ferret out a suspect is reasonable under these circumstances. By all accounts, when a weapon is missing from a safe during the course of a break-in, it is reasonable for the responding officers to believe the suspect is violent and armed. In addition, given that Myers did not reveal himself to the officers, the situation presents a heightened danger. These facts, coupled with the fact that the action complained of took place during the course of an arrest that Myers actively resisted, satisfy the Graham factors and weigh in favor of extending qualified immunity to Calchi and Phillips.[8]

Finally, the record reflects that Calchi gave a command for Chase to release Myer's ear even as Myers continued to resist Phillips. In his video-taped statement to police, Myers agreed he did not respond to, and that he heard, Calchi's announcement that Chase would be deployed if he did not

---

[8]Plaintiff argues that the fact that Chase bit Myers' ear is excessive; but on this record, it appears Chase reacted to aggressions by Myers, whose punching caused the dog to disengage then reengage. Plaintiff also argues that Chase was unruly because he bit a responding officer before he engaged Myers. While this argument may have some merit, the unchallenged narrative of Calchi and Phillips depict an uncompliant Myers.

present himself.  Myers agreed that he hid and that he resisted arrest. Myers agreed he was armed. On this record, there is no evidence to suggest or to create a genuine issue of material fact as to whether the force "was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Brooks, 204 F.3d at 106. Calchi and Phillips responded to a dangerous situation, where the potential suspect may have been armed, presenting a danger to the officers, and where the suspect actively resisted arrest in a quickly escalating encounter, after hiding in the dark.

Viewing the facts in a light most favorable to Plaintiff and "from the perspective of a reasonable officer on the scene," the Court finds that the force deployed by Calchi and Phillips to effectuate the arrest of Myers was reasonable under the circumstances.  Summary judgment will be granted in favor of Calchi and Phillips on grounds of qualified immunity. In addition, because the Court concludes that there is no constitutional violation, summary judgment will also be granted in favor of Chief Farabella and the City of Millville as to the Monell claim. Finally, because the Court concludes that the officers acted reasonably under the circumstances, summary judgment will be granted as to Plaintiff's tort claims as set forth in Counts V and VI.

## IV.   <u>Conclusion</u>

For the reasons set forth above, summary judgment will be granted as to the claims against Officers Calchi and Phillips on grounds of qualified immunity.  Summary judgment will also be granted as to the claims against Officer Profitt by virtue of Plaintiff's concession that he was not involved in Myers' apprehension and/or arrest.  Summary judgment is also granted in favor of Chief Farabella and the City of Millville because Myers' for lack of a Constitutional violation.  Summary judgment is granted as to Plaintiff's claims of negligence and battery.

An appropriate Order shall issue.

Dated June 30, 2020.

s/ Joseph H. Rodriguez
HON. JOSEPH H. RODRIGUEZ
United States District Judge
